IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MARK ANTHONY HART,
      Plaintiff,

vs.                                       Case No.: 5:12cv156/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 6, 9).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence and comport with proper legal principles.  The decision of the Commissioner is therefore affirmed.

## I.      PROCEDURAL HISTORY

On April 1, 2008, Plaintiff filed applications for DIB and SSI, and in each application he alleged disability beginning January 1, 2005 (tr. 24).[2]  His applications were denied initially and on

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Michael J. Astrue as the Defendant in this case.

[2]  All references to "tr." refer to the transcript of Social Security Administration record filed on August 13, 2012 (doc. 8).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

reconsideration, and thereafter he requested a hearing before an administrative law judge ("ALJ"). The ALJ held a hearing on July 12, 2010, and on October 22, 2010, she issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (tr. 24–33). The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.     FINDINGS OF THE ALJ

In her October 22, 2010, decision the ALJ made the following findings:

1.      Plaintiff meets the insured status requirements of the Act through June 30, 2011.[3]

2.      Plaintiff has not engaged in substantial gainful activity since January 1, 2005, his alleged onset date.

3.      Plaintiff has the following severe impairments: mild scoliosis, mild degenerative disc disease, status post aortic valve replacement, status post repair of an aortic aneurysm, and rupture of the anterior cruciate ligament of the left knee with meniscal tear.

4.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment.

5.      Plaintiff has the residual functional capacity ("RFC") to perform light work, except he requires a sit/stand option.[4]

6.      Plaintiff is unable to perform any past relevant work.

7.      Plaintiff was born on December 6, 1960, and thus on his alleged disability onset date

---

[3] The time frame relevant to Plaintiff's claim for DIB therefore is January 1, 2005 (date of alleged onset), through October 22, 2010 (date of the ALJ's decision), even though Plaintiff is insured for DIB purposes through June 30, 2011. The time frame relevant to his claim for SSI is April 1, 2008 (date of application for SSI) through October 22, 2010 (date of ALJ's decision). See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file). Thus the time frame relevant to this appeal is approximately January 2005 through October 2010.

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b); § 416.967(b).

he was forty-four years old, which is defined as a younger individual aged 18–49.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      The Medical-Vocational Rules, used as a framework for decisionmaking, support a finding that Plaintiff is "not disabled." Thus, regardless of whether Plaintiff has transferable job skills, transferability of job skills is not material to the disability determination.

10.     In light of Plaintiff's age, education, work experience, and RFC, and based on the testimony of the VE, jobs exist in significant numbers in the national economy that Plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Act, from January 1, 2005, through the date of the decision.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations

omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[5] the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

---

[5] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416).  Therefore, citations in this Order should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     HEARING TESTIMONY AND MEDICAL HISTORY[6]

     A.     Hearing Testimony

At the July 12, 2010, administrative hearing, prior to being placed under oath, Plaintiff stated that his disabled wife had recently passed away and that he had served as her "primary care taker" during her illness (tr. 46). Testifying under oath, Plaintiff reported that this care included bathing her and making sure she had clean clothes and that the house was clean (tr. 53). Plaintiff stated that he, along with his teenage son, had provided meals on a regular basis and transportation to medical appointments (id.). Plaintiff acknowledged these were very physical activities but explained he had been able to perform them due to "all of the medication . . . ." (tr. 54). Also, according to Plaintiff, his son had done "a lot of the physical activity" under his supervision (id.).

At the time of the hearing Plaintiff's brother was living with Plaintiff and his son (tr. 62). Plaintiff testified that his brother does the housekeeping and yard work (tr. 62), and his son does the grocery shopping (tr. 62–63). Plaintiff testified that it takes him about three hours to get up in the morning because his heart races (tr. 51). He uses a four-pronged walker to get out of bed and move

---

[6] The court's August 14, 2012, Scheduling Order, in relevant part, directs Plaintiff to "specifically cite the record by page number for factual contentions," and it further informs that the "[f]ailure . . . to support factual contentions with accurate, precise citations to the record will result in the contention(s) being disregarded for lack of proper development." (doc. 14 at 1–2, emphasis in original). The court notes that numerous of Plaintiff's citations do not comply with the court's instructions. Rather, there are references that include as many as thirty pages grouped together in one citation (see, e.g., doc. 11 at 14, first partial paragraph). Others consist of a long string of impairments followed by a long string of page citations that are not correlated to specific impairments (see, e.g., doc. 11 at 13, first full paragraph; id. at 14, first partial paragraph and second full paragraph; id. at 17, second full paragraph; id. at 18, first partial paragraph). Neither type of reference is acceptable. Instead of saving the court's time in locating references, these practices lengthen it, requiring the court to scour each page for numerous possible matches. As explained below, see n.17, infra, in future cases it is unlikely that the court will simply admonish counsel about his noncompliance with the court's Scheduling Order.

about because of pain in his low back and hips (*id.*). He reads during the day (tr. 61). "With no wife in the house," Plaintiff, his brother, and his son eat sandwiches, which Plaintiff is able to make (tr. 63). Plaintiff needs to take breaks between doing chores. If he does laundry, for example, he finds it necessary to rest every fifteen to twenty minutes (tr. 75). He feels fatigued, partly from back pain and partly from depression due to his wife's recent death (tr. 73).

Plaintiff also testified that he suffers from a heart condition and has undergone two open heart surgeries (tr. 63–64). According to Plaintiff, he experiences palpitations every day (tr. 65), which cause him to lie down and close his eyes for thirty minutes to an hour (tr. 65–66). He also lies down when he experiences chest pains, which is about once a week (tr. 66–67). Plaintiff takes a nap every day, due to fatigue (tr. 66; 73). With any physical activity he experiences shortness of breath (tr. 66), and he also has pain and swelling in his left leg, knee, ankle, and foot (tr. 60–61). Swelling is a daily problem which affects his ability to walk (tr. 67–68) and requires him to spend three hours elevating his left leg to try to reduce the swelling (tr. 68).

In addition to his heart and related problems, Plaintiff testified that he has experienced problems with his back (tr. 68) and with arthritis (tr. 72). He suffers pain in his neck, shoulder blades, low back, and hips (tr. 51; 69), with physical activity causing his pain to increase (tr. 69). On a scale of one to ten, with ten being the worst pain, Plaintiff testified his pain—for which he takes Lortab—is an eight or nine in the morning and late at night, but it never gets better than a five or six (tr. 70). Pain affects Plaintiff's ability to concentrate (tr. 72), and he experiences side effects from his medications, such as vertigo, palpitations, and drowsiness (tr. 73–74). Plaintiff stated that he has difficulty bending, reaching overhead, squatting, and standing and sitting for prolonged periods (tr. 52; 72). He is able to stand for thirty to forty-five minutes at one time; walk for fifteen to twenty minutes at one time; and sit for twenty to thirty minutes before needing to stand (tr. 70–71). Plaintiff estimated he could lift about twelve pounds without experiencing pain (tr. 71). Plaintiff's past jobs included work as a painter, forklift operator, and maintenance worker (tr. 56–58).

Addressing the VE, the ALJ asked her to assume an individual of Plaintiff's age, education, and work history; the ALJ also asked the VE to consider Plaintiff's testimony concerning his physical complaints which made him unable to sit, stand, or walk for more than two hours, total, spread over the course of an eight-hour workday (tr. 79). If this individual were capable of performing light work

with a sit/stand option, the VE testified, he would be precluded from performing all of Plaintiff's past work, including the forklift operator's job (tr. 80). There were other jobs in the national economy at the light exertional level with a sit/stand option, however, that the individual could perform, including the unskilled jobs of silver wrapper, mail clerk, and cashier II (*id.*). In response to a question posed by the ALJ, the VE stated that she knew the positions could be performed with a sit/stand option because she had "observ[ed] them as they're performed [ ]" (tr. 81). Otherwise, the descriptions of the jobs were consistent with the Dictionary of Occupational Titles (*id.*). When asked by Plaintiff's counsel whether the hypothetical individual could perform any of the jobs she had identified if the individual needed to elevate his leg to hip level for three hours every day, the VE indicated he could not (tr. 82). Counsel also asked whether the individual could perform any of the identified jobs if pain prevented him from concentrating or staying focused for two hours at a time (*id.*). The VE indicated that concentration, persistence, and pace would have to be maintained for a two-hour period in order for the individual to remain employed (tr. 83).

    B.    Plaintiff's Medical History[7]

    As stated in an August 2006 treatment note, in 2002 Plaintiff sustained an injury to his left knee while he was performing martial arts, but the injury was not treated at the time (tr. 562). An examination in 2006 revealed no effusion, mild medial joint line tenderness, and full range of motion (*id.*). Magnetic resonance imaging ("MRI") obtained in 2006 showed tears of the anterior cruciate ligament and meniscus (*id.*; *see also* tr. 567–68). In January 2007, due to back pain, Plaintiff underwent x-rays of the lumbar and thoracic spine, which indicated minimal spondylosis (tr. 275).

    Plaintiff has a history of rheumatic fever and valvular heart repair in 1970 when he was a child (tr. 302; duplicate at tr. 348). An echocardiogram taken in 2006 showed left ventricular hypertrophy and mild aortic and tricuspid regurgitation (tr. 274). A Nuclear Stress Test Imaging Report from February 2008 indicated there was preserved left ventricular systolic function with an ejection fraction

---

[7] The information in this section is largely derived from the ALJ's opinion (tr. 24–33) (which facts regarding Plaintiff's medical treatment and vocational history the Commissioner adopts in her memorandum (doc. 14 at 4)), or Plaintiff's memorandum in support of his complaint (doc. 11).

of 65%[8]; there were also abnormal Myoview perfusion images with a reversible defect noted in the basal and mid inferior walls, with a fixed defect noted in the apex (tr. 302; 360). Additionally, an echocardiogram obtained in February 2008 revealed markedly dilated aortic root and ascending aorta, with defects of the aortic valve (tr. 302). Plaintiff's cardiologist, Amir R. Haghighat, M.D., noted that Plaintiff recently had been experiencing extreme fatigue, palpitations, a racing heart, and some shortness of breath and chest pain (*id.*). Right heart catheterization performed in March 2008 in part revealed dilated aortic root and a calcified aortic valve (tr. 298).

On May 22, 2008, Plaintiff underwent surgery for an aortic valve and root replacement and repair of an aortic aneurysm (tr. 310–11; 312–13; 315–17). Plaintiff developed serious post-surgery complications, including ventricular fibrillation, cardiac arrest, respiratory failure, and renal failure (tr. 324; 387–89). By the following month, however, when Plaintiff presented for an office call to Dr. Haghighat, Plaintiff's condition had improved significantly (tr. 347). Dr. Haghighat noted that Plaintiff had no chest pain, pressure, tightness, heaviness, dyspnea, PND [paroxysmal nocturnal dyspnea], orthopnea, syncope, near syncope, or palpitations (tr. 347). He was walking at least thirty minutes per day without exertional complaints (*id.*). Plaintiff did exhibit peripheral edema, with the left leg—which had been the site of saphenous vein harvesting for his cardiac surgery—being worse than the right (*id.*). Dr. Haghighat also noted that while hospitalized Plaintiff had suffered multiple ventrical fibrillation episodes which required multiple external defibrillations; his symptoms had been well managed with medications, however, and he had suffered no sustained recurrent episodes (*id.*).

By July 7, 2008, on a follow-up visit to his cardiac surgeon's office, Plaintiff was described as being "asymptomatic" (tr. 309). On examination, his lungs were clear and auscultation of the heart revealed crisp and sharp mechanical valve tones with no murmurs (*id.*). Plaintiff was released from surgical follow-up care and returned to the care of Dr. Haghighat and his primary physician, Jason Hatcher, D.O. (*id.*). A July 14, 2008, visit to Plaintiff's pulmonologist's office was similarly unremarkable (tr. 386). Plaintiff reported walking up to 1 and ½ miles per day without having to stop, and he denied edema of the lower extremities, angina, or palpitations (*id.*).

---

[8] An ejection fraction of 55–70% is considered normal, and an ejection fraction of 40–55% is considered below normal. *See* http://my.clevelandclinic.org/heart/disorders/heartfailure/ejectionfraction.aspx (last visited August 23, 2013).

An echocardiogram taken on August 7, 2008, revealed normal left ventricular systolic wall motion with an ejection fraction of 60%; mild biatrial enlargement; mechanical valve in aortic position with physiologic aortic insufficiency and normal functioning; trace mitral and tricuspid regurgitation; and right ventricular systolic pressure of 31 mmHg (tr. 427). The report of a post-surgery physical examination in September 2008 noted the findings of the August 2008 echocardiogram and indicated that Plaintiff "is otherwise asymptomatic" (tr. 384). Plaintiff was also seen in Dr. Hatcher's office, by physician's assistant ("PA") Steven Walter and another PA, Karen F. Baxley, in September and October 2008 for follow up, when it was noted his post–surgery status was unchanged (tr. 457) or moderately improved (tr. 458).[9] On October 3, 2008, Dr. Haghighat reported physical findings similar to those he had found at Plaintiff's July 2008 visit (tr. 434). Plaintiff's peripheral edema was still present, although somewhat improved (*id.*). Plaintiff's main complaint at that time was "back pain which seems to be limiting his activity" (*id.*). Plaintiff again complained of back pain several times in November 2008; one instance Plaintiff attributed his back pain to "doing some work on his car," strenuous physical activity which he reported his cardiologist did not want him to do at that time (tr. 459; 460). Plaintiff also complained of increasing back pain in December 2008 and stiffness in the back and hands (tr. 477), and in January 2009 he reported problems with his blood pressure (tr. 474–75). In January 2009 he also reported worse back pain "since being off NSAID's" (tr. 473).

At his next visit to Dr. Haghighat, on January 20, 2009, Plaintiff reported that he had been doing well with no chest pain, no significant dyspnea, and no angina, although he had some abdominal pain that his primary physician was investigating as having a possible gastrointestinal etiology (tr. 468; duplicate at tr. 513). Plaintiff was on diuretic therapy for his chronic edema (*id.*). Plaintiff was advised to continue to follow up with Dr. Hatcher for further adjustments in his blood pressure medication. Dr. Haghighat noted that a preliminary assessment of an echocardiogram indicated that Plaintiff's ejection fraction was preserved and the valve looked good (*id.*). Absent any

---

[9] Physician's assistants, and other non-physicians such as advanced registered nurse practitioners, are excluded from the list of "acceptable medical sources" whose opinions are to be considered in determining the existence of an impairment. 20 C.F.R. §§ 404.1513(a), 416.913(a). They are considered "other sources," whose opinions may be used to show the severity of the impairment and how it affects the ability to work. 20 CFR §§ 404.1513(d), 416.913(d).

concerns that arose earlier, Plaintiff was advised to return in one year (*id.*). Dr. Haghighat noted that Plaintiff had expressed "some physical limitations and concern about his disability status" (*id.*). Dr. Haghighat advised him to follow up with Dr. Hatcher "especially since most of the complaints sound musculoskeletal in origin and he relates he has been studied by MRI of the back in the past" (*id.*).

On January 9, 2009, PA Walter completed a Source Orthopedic Questionnaire for Plaintiff (tr. 463). He noted that Plaintiff had an anterior cruciate ligament tear and meniscal tear of the left knee, lower back pain, and thoracic back pain. Plaintiff's symptoms included chronic pain and joint deformity related to the orthopedic impairment. PA Walter reported that Plaintiff had 4/5 grip strength, 5/5 strength in the lower extremity on the right, and 3/5 strength in the lower extremity on the left. Plaintiff could perform fine/gross manipulation on a sustained basis. A hand-held assistive device was not medically necessary for ambulation. Treatment notes by PA Walter from February 2009 indicate that Plaintiff reported chest pain but no shortness of breath or edema (tr. 548). The assessment included chest pain, "probably due to post-thoracotomy," and chronic back pain. Plaintiff also received prescriptions for Lortab and other medications (for depression, hypertension, and anxiety) (tr. 549). In March 2009 Plaintiff reported less chest pain and no shortness of breath or edema (tr. 546). The assessment included chronic back pain, chest pain, and anxiety; Plaintiff was given prescriptions for pain, anxiety, and hypertension (*id.*). Plaintiff returned in April 2009 for medication refills and a rash on his feet (tr. 543). He reported that he had been "quite active," including mowing his grass, which had made him feel a little sore (*id.*). Plaintiff complained of back pain in May 2009 and reported a visit to the emergency room for abdominal pain. The assessment included chronic back pain and an umbilical hernia (tr. 542). Plaintiff reported pain in his back and left knee in June 2009 (tr. 537). His pain, blood thinning, anxiety, and anti-depression medication prescriptions were refilled (tr. 538).

Plaintiff presented to PA Walter several times in July 2009, when the assessments included chronic back pain (tr. 521; 526; 528; 532; 535); dizziness (tr. 521; 523–24); knee pain (tr. 521; 538); anxiety (tr. 521; 535); generalized osteoarthrosis (tr. 521; 528; 535); edema after briefly discontinuing diuretic medication (tr. 527–28); fractures of two ribs (tr. 524); and shortness of breath (tr. 524; 530; 532). Plaintiff received numerous prescriptions for anxiety, pain, arthritis relief, and hypertension (*see, e.g.,* tr. 521; 526; 528; 535).

An echocardiogram taken on July 24, 2009, indicated mild left ventricular hypertrophy; mild left atrial and right ventricular dilatation with the left ventricle at the upper limits of normal in size; minimal decrease in left ventricular ejection fraction which was calculated to be between 50 and 55%; status post aortic valve replacement with mild aortic regurgitation; mild mitral and pulmonic regurgitation; and moderate tricuspid regurgitation (tr. 512). An echocardiogram taken on March 1, 2010, was compared to the January 2009 study (tr. 572). It noted that the tricuspid insufficiency had increased from mild to moderate/marked but that the estimated right ventricular systolic pressure was stable and hypokinesis of the right ventricular wall was not noted (*id.*). The peak systolic gradient of the aortic mechanical prosthesis had increased, but it remained within the normal range. The ejection fraction was 55% (*id.*).

On March 1, 2010, Dr. Haghighat saw Plaintiff again (tr. 570). Plaintiff reported that he had experienced some chronic mild dyspnea on exertion (*id.*). He had not suffered chest pain but had experienced back pain, especially in his upper back and when bending, which was making it increasingly difficult for him to do manual labor (*id.*). Plaintiff's primary doctor had prescribed Lortab for pain but Plaintiff felt "'he never gets enough'" (*id.*). Dr. Haghighat noted that the initial echocardiogram report did not reflect any significant problem with the aortic valve, and he advised a repeat procedure in one year. He found no edema but indicated that Plaintiff remained on diuretic therapy for this condition (*id.*). With respect to Plaintiff's back pain, Dr. Haghighat advised Plaintiff to follow up with his primary physician (*id.*).

An MRI of the lumbar spine taken on June 28, 2010, revealed mild desiccation of the lumbar discs with slight developmental irregularities (tr. 558). The most severe visualized disc disease appeared to be at T10-T11, but no nerve root compression or spinal stenosis was detected, and there was no apparent fracture or spondylolisthesis. An MRI of the thoracic spine taken on June 29, 2010, documented mild scoliosis and accentuation of the kyphosis with multilevel chronic thoracic disc disease (tr. 560). The reviewing radiologist noted that no spinal stenosis or actual thoracic intervertebral disc herniation was detected and that the patient's symptoms likely were related to degenerative disease (*id.*).

In June 2010, advanced registered nurse practitioner ("ARNP") Michael Kennedy, in Dr. Hatcher's office, examined Plaintiff (tr. 554–57). He noted that the general appearance of the lower

extremities was normal, with somewhat decreased muscle strength and +2 edema in both feet; also, Plaintiff exhibited decreased range of motion of both knees, had a somewhat guarded gait after starting to walk, and was slow to rise (tr. 556). Plaintiff was advised to take his diuretic medication with potassium (tr. 554). ARNP Kennedy noted there was no scoliosis, kyphosis, or bony tenderness. Flexion, extension, side bending and rotation were all somewhat decreased (tr. 556). His assessments included chronic back pain, anxiety, muscle spasm, meniscus tear, osteoarthrosis, pain in the thoracic spine, depression, and other malaise and fatigue (tr. 557). Plaintiff reported that he could perform his daily activities with mild or moderate pain, and anxiety at times affected his ability to do them (tr. 555). He noted that he had been "trying to work more lately – this is increasing his pain and edema" (*id.*). Plaintiff was prescribed medications for pain, anxiety, and depression (tr. 557). He reported that his medications were causing no side effects (tr. 555).

C.     Other Medical Evidence of Record

On October 30, 2008, Robert Steele, M.D., a non-examining State agency consultant, completed a physical RFC assessment for Plaintiff (tr. 439–46). Dr. Steele found that Plaintiff had the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours (tr. 440). His ability to push and/or pull was unlimited. Dr. Steele found no postural, manipulative, visual, communicative, or environmental limitations (tr. 441–43). Another non-examining State agency consultant, John A. Dawson, M.D., reached the same conclusions concerning Plaintiff's abilities and limitations in a physical RFC assessment he completed for Plaintiff on February 20, 2009 (tr. 499–506).

George L. Horvat, Ph.D., examined Plaintiff consultatively on August 5, 2008 (tr. 366–68). Dr. Horvat concluded that Plaintiff suffered from adjustment disorder with depressed mood and pain disorder (tr. 368). He estimated that Plaintiff's Global Assessment of Functioning ("GAF") score was 70, which indicated he had mild psychological symptoms.[10] Dr. Horvat noted that if Plaintiff could

---

[10] GAF is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. GAF scores between 61 and 70 reflect mild symptoms, with some difficulty in social and occupational functioning.

be cleared physically to work there were no psychological reasons why he could not work. Two non-examining State agency psychologists, Thomas Conger, Ph.D., and Judith E. Meyers, Psy.D., also reviewed the evidence and prepared Psychiatric Review Technique forms in which they opined that Plaintiff had no severe mental impairment (tr. 369–82; 485–98). Both of the non-examining psychologists concluded that Plaintiff had no restrictions of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (tr. 379; 495).

V.     DISCUSSION

Plaintiff's grounds for relief, in the order in which the court addresses them, are that the ALJ erred by 1) failing to properly apply the Eleventh Circuit's pain standard; 2) relying on Plaintiff's activities of daily living to discount his credibility; 3) failing to support the RFC assessment with a treating or examining physician's assessment; and 4) failing to properly assess Plaintiff's ability to alternate sitting and standing, as required by Social Security Ruling ("SSR") 96-9p, 1996 WL 374185 (July 2, 1996). As relief, Plaintiff seeks reversal and remand with an award of benefits or, alternatively, remand for further proceedings (doc. 11 at 20). The Commissioner responds that Plaintiff had a fair hearing and received full administrative consideration in accordance with applicable statutes and regulations. She submits that her decision should be affirmed because substantial evidence supports the determination that Plaintiff was not disabled on or before October 22, 2010 (doc. 14 at 15).

Grounds 1 and 2

Pain and other subjective complaints are treated by the regulations as symptoms of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the Hand test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Hand v. Heckler, 761 F.2d 1545, 1548 (11th Cir. 1986) (originally adopting the three-part pain standard).  The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Ogranaja v. Commissioner of Social Security, 186 F. App'x 848, 2006 WL 1526062, at *3 (11th Cir. June 5, 2006) (quoting Wilson); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptom]."  Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[11]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed symptom].  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts to ensure that the finding is supported by substantial evidence."  Hand, 761 F.2d at 1548–49.  It is within the ALJ's "realm of judging" to determine whether "the quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984).  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the claimant] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor, 786 F.2d at1054; Holt, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication

[11]  Decisions of the United States Court of Appeals for the Fifth Circuit decided on or before September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

must be obvious to the reviewing court. The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted). The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Dep't of Health and Human Serv., 941 F.2d 1529, 1532 (11th Cir. 1991).

Plaintiff argues that he fully satisfies the Hand test: the evidence concerning his heart, back, and knee conditions shows he has underlying medical conditions which could reasonably be expected to produce the pain of which he complains (doc. 11 at 14–15). The ALJ agreed that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms (tr. 28). After thoroughly outlining the medical evidence, however, the ALJ concluded that despite the severity of Plaintiff's subjective complaints there was only minimal objective evidence of a disabling impairment, rendering his testimony less than fully credible (tr. 28–30). This conclusion is supported by substantial evidence.

As the ALJ noted, although Plaintiff complains of heart palpitations, chest pain, fatigue, and dyspnea, Dr. Haghighat's records after Plaintiff's recovery from his May 2008 heart surgery consistently, with the exception of some mild dyspnea on one occasion (tr. 570), reflect that Plaintiff reported he was doing well with no cardiac complaints (*see* tr. 309; 384; 386; 457; 458; 468; 570). In addition, objective medical tests obtained after Plaintiff's cardiac surgery, specifically echocardiograms obtained in August 2008, July 2009, and March 2010, showed ejection fraction results varying from 50–55% to 65%, or in the normal or slightly below normal range (tr. 427; 468; 512; 572). Also, as the ALJ noted, when Plaintiff raised the matter of his disability status to Dr. Haghighat in January 2009, Dr. Haghighat indicated that most of Plaintiff's complaints were musculoskeletal in nature and thus he should contact his primary physician (tr. 468). The ALJ reasonably inferred from Dr. Haghighat's response to Plaintiff's inquiry that Dr. Haghighat did not consider Plaintiff's heart condition to be disabling. The ALJ also noted that Plaintiff smokes a pack of cigarettes per day, drinks three to four alcoholic beverages per day, and has smoked marijuana for

the past thirty years—all of which activities reasonably suggested to the ALJ that the symptoms from Plaintiff's heart condition were "not particularly troublesome" (tr. 30).

The ALJ also discussed Plaintiff's complaints of chronic back pain, concluding that Plaintiff's record of treatment did not support an inability to work based on a back impairment. The ALJ noted the January 2007 radiographs showed only "minimal" spondylosis (tr. 275), and the June 2010 MRIs taken of Plaintiff's lumber and thoracic spine, although they revealed the presence of chronic disc disease that could be the cause of Plaintiff's complaints of back pain, did not identify severe defects (tr. 558; 560). The ALJ also cited the treatment notes from Dr. Hatcher's office which reflect Plaintiff's numerous subjective complaints of back pain and repeated requests for and receipt of pain medication but little in the way of objective findings based on physical examination (*see* tr. 521; 526; 528; 532; 535; 537; 538; 552–53; 546; 548; 549). In his January 2009 Source Orthopedic Questionnaire, PA Walter notes Plaintiff's complaints of back pain (tr. 463), but the physical findings he cites—such as reduced grip and left leg strength—do not appear to be directly related to Plaintiff's spine condition. And, although Plaintiff testified he requires a four-point walker to move about due to hip and back pain, PA Walter found no medical need for Plaintiff to use a hand-held assistive device. The notes of ARNP Kennedy's June 2010 examination—which was conducted just one month prior to the July 2010 administrative hearing and about the same time as the June 2010 MRIs were obtained—are somewhat more detailed. But, just as the ALJ concluded generally about the record, these notes too are insufficient to support a finding that Plaintiff's back impairment prevents him from working. ARNP Kennedy found no scoliosis, kyphosis, or bony tenderness and, importantly, he concluded that Plaintiff's flexion, extension, side bending and rotation of the spine were all only "somewhat decreased" (tr. 556).

As to Plaintiff's complaints of left knee pain, the 2006 MRI establishes the existence of an underlying medical condition involving tears of the anterior cruciate ligament and meniscus. But this MRI, as well as the notes from ARNP Kennedy's June 2010 examination, do not suggest Plaintiff's knee condition could reasonably be expected to give rise to the disabling symptoms alleged. Indeed, the findings related to Plaintiff's left knee in PA Walter's January 2009 Source Orthopedic Questionnaire reflect little more than that Plaintiff had reduced strength in the left leg and did not

require the use of an assistive device to walk. Similarly, the report of ARNP Kennedy's one-time June 2010 examination contains only minimal, vague findings concerning Plaintiff's left knee. For example, the report indicates that Plaintiff exhibited decreased strength of *both* lower extremities and decreased range of motion of *both* knees. The degree of decrease is not specified. Furthermore, Plaintiff does not appear to allege, and points to nothing in the record that indicates, he suffers a problem with his right knee.

The ALJ noted Plaintiff's hearing testimony that he experiences swelling in the left leg and he must elevate his leg for three hours per day (tr. 30). While ARNP Kennedy noted +2 edema in Plaintiff's feet in June 2010, other than his hearing testimony Plaintiff has not identified evidence showing that he must elevate his left leg each day for three hours due to swelling. To the contrary, although the record contains numerous references to Plaintiff's chronic edema condition, nothing in the record cited by Plaintiff (*see* doc. 11 at 14, citing tr. at 274–75; 282; 296; 302–03; 309–18; 321–43; 347–48; 384; 386–89; 403–18; 427–31; 434; 455–61; 468–70; 472–84; 512–42; 554–67; 570–72; 577–80), or located by the court, constitutes more than minimal objective evidence of a disabling impairment. The evidence reflects one reported instance of edema that occurred in June 2008, or approximately one month after Plaintiff's May 2008 cardiac surgery, which might have been related to vein harvesting during the procedure (tr. 347). A month later, in July 2008, Plaintiff denied any edema (tr. 386). In October 2008 it was noted that Plaintiff had a chronic peripheral edema condition which had improved (tr. 434). Plaintiff reported having no problems with edema in February and March of 2009 (tr. 546; 548). In July 2009 Plaintiff indicated he had briefly discontinued taking his diuretic medication, and he was advised to resume taking it daily (tr. 527–28). In March 2010, when Plaintiff reportedly was on diuretic therapy, no extremity edema was observed (tr. 570). Although +2 edema of the feet was observed in June 2010, this single report does not appear to be representative of the findings on physical examination made over the course of approximately

two years.[12]  As the ALJ concluded, none of the above evidence supports the credibility of Plaintiff's testimony concerning his pain and other subjective symptoms.

The ALJ also relied on Plaintiff's activities to discount his credibility, specifically the care Plaintiff provided for his wife during her last illness (tr. 30).  The ALJ found Plaintiff's activities to be "not as limited as one would expect given his complaints of a disabling impairment" (*id.*).  According to Plaintiff, this was error because he merely supervised the care his teenage son provided (doc. 11 at 17).  Plaintiff submits that his ability to supervise his wife's care and to make sandwiches does not indicate he is not disabled (*id.*).

The Commissioner may consider activities of daily living in assessing a claimant's credibility.  Macia v. Bowen, 829 F.2d 1009, 1011–12 (11th Cir. 1987); Couch v. Astrue, 267 F. App'x 853, 856 (11th Cir. 2008).  The Regulations in fact provide that daily activities are to be considered in determining the credibility of the claimant's subjective complaints. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  Here, Plaintiff appears to argue that he did little more than oversee the care of his wife during her illness (doc. 11 at 17).  But at the administrative hearing Plaintiff stated he had acted as his wife's "primary care taker" (tr. 46).  Also, although Plaintiff additionally indicated that his son did "a lot of the physical activity" (tr. 54), Plaintiff specifically testified under oath that he himself bathed his wife and made sure she had clean clothes and the house was clean (tr. 53).  In light of Plaintiff's testimony, it was not error for the ALJ to consider Plaintiff's role as a caregiver in evaluating, and discounting, his credibility.  Moreover, the court finds no merit in Plaintiff's contention that the ALJ failed to consider the entire record, including all of the medical evidence and the evidence of his daily activities, in reaching her credibility determination.  Rather, the court is satisfied that the ALJ's decision is adequate in this regard.  In outlining the record and concluding that the minimal evidence of a disabling impairment did not support Plaintiff's allegations, the ALJ in fact references the evidence cited by Plaintiff, such as his testimony that he needs to take a nap due to

---

[12] Plaintiff testified at the administrative hearing that he experiences vertigo as a side effect of his medications (tr. 74), but this problem likewise does not appear to be well-represented in his medical records.  Plaintiff does not point to evidence in the record showing that he reported medication side effects to his health care providers, and the only evidence that might be related to this condition of which the court is aware are the records showing that on several occasions in July 2009 Plaintiff reported being dizzy (tr. 521; 523–24).  In any event, as recently as June 2010, Plaintiff stated to ARNP Kennedy that his medications were causing no side effects (tr. 555).

fatigue (tr. 28) and elevate his leg for three hours daily due to problems with the left knee (tr. 30). The ALJ's decision also references Plaintiff's testimony concerning his exertional limitations (tr. 28), and it adequately discusses the medical evidence concerning his complaints of pain (tr. 28).[13]

Summarizing, the court finds that Plaintiff's testimony that he is disabled from his heart condition is undermined by the objective evidence which suggests that, after initially experiencing serious complications from his May 2008 surgery, he made a good recovery and continued to do fairly well. Similarly, the evidence of Plaintiff's back and knee conditions, including the radiological studies and scant objective findings in the treatment notes, detracts from Plaintiff's credibility. The ALJ cited and properly applied the Hand test in finding Plaintiff's conditions could not reasonably be expected to give rise to the claimed symptoms, and her conclusion that there is minimal evidence of a disabling impairment, thus eroding the credibility of Plaintiff's subjective testimony, is supported by substantial evidence. Grounds 1 and 2 for relief therefore fail.


Grounds 3 and 4

In Ground 3, Plaintiff contends that the ALJ was required, but failed, to support the RFC assessment with a treating or examining physician's RFC assessment. Citing SSR 83-10, Plaintiff first submits that the RFC is a medical assessment and therefore "the ALJ is required to have evidence

---

[13] Plaintiff also states that the ALJ should have considered the evidence of his "sleep disturbance" (doc. 11 at 18), and indeed the ALJ's decision makes no mention of any sleep issues. Plaintiff fails to identify *with specificity* where in the record evidence of this impairment may be located, although the court found several brief mentions of "sleep problems" in the treatment notes from Dr. Hatcher's office that Plaintiff cites generally (*see* doc. 11 at 18). The record from November 2008 reflects that Plaintiff was referred for a sleep apnea study; Plaintiff does not, however, point to any evidence showing the study was performed or any results from it. Also, the treatment note from May 2009 indicates that Plaintiff reported he had been sleeping well prior to recently suffering some abdominal pain (tr. 541). In June 2009 Plaintiff again reported he had been sleeping well (tr. 537). "Sleep Problems" were noted in July 2009, with Plaintiff reporting improved sleep with medication (tr. 521). In August 2009 "sleep problems" again were noted, with no elaboration (tr. 518).
    Although the ALJ has a duty to fully and fairly develop the record, Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003), the claimant nevertheless is also obligated, in some reasonable fashion, to raise the issue sought to be developed. Wall v. Astrue, 561 F.3d 1048, 1062–63 (10th Cir. 2009) (ALJ has a duty to develop the record consistent with the issues raised). In the instant case, Plaintiff did not testify about any sleep problems at the administrative hearing, and his attorney did not bring any such concerns to the attention of the ALJ. Moreover, and dispositively, the medical evidence concerning this alleged impairment is so minimal that, on its face, no substantial issue exists. *See* Hawkins v. Chater, 113 F.3d 1162, 1167 (10th Cir. 1997) (issue sought to be developed must be substantial on its face).

from a physician which supports her RFC assessment given that it is by definition 'a medical assessment.'" (doc. 11 at 8).

In the Eleventh Circuit, Social Security Rulings are not binding on the courts, although they are entitled to deference.  Fair v. Shalala, 37 F.3d 1466, 1467 (11th Cir. 1994).  No deference is due, however, if the Ruling is inconsistent with a regulation; instead, the regulation controls.  *See* Langley v. Astrue, 777 F. Supp. 2d 1250, 1253 (N.D. Ala. 2011) (citation omitted).  In 1991, some eight years after SSR 83-10 was issued, § 404.1545—which in part SSR 83-10 cites as authority—was amended to delete language that defines the RFC as a medical assessment.  The current version provides in pertinent part:  "Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record." § 404.1545(a).  Moreover, § 404.1527(a)(2) provides that "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  Another subsection of § 404.1527 specifically provides that opinions on issues reserved to the Commissioner are not medical opinions:

> Medical source opinions on issues reserved to the Commissioner.  Opinions on some issues, such as the examples that follow, are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

§ 404.1527(d).  One of the listed examples states that "Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner.  § 404.1527(d)(2).

In short, this court agrees with Langley, which stated that under "the current regulations, a claimant's RFC is specifically excluded from being considered a medical opinion, and thus cannot be a medical assessment."  Langley, 777 F. Supp. 2d at 1253.  The court then held that because "the language in SSR 83-10 that defines RFC as a medical assessment is inconsistent with, and contrary

to, the current regulations," the definition of RFC contained in SSR 83-10 has been superseded by regulation." *Id.*

Additionally, Plaintiff's reliance on <u>Coleman v. Barnhart</u>, 264 F. Supp. 2d 1007 (S.D. Ala. 2003) (concluding that at step five the burden is on the Commissioner to establish claimant's RFC through the RFC assessment of a treating or examining physician), and <u>Thomason v. Barnhart</u>, 344 F. Supp. 2d 1326 (N.D. Ala. 2004) (finding that lack of a formal assessment by an examining or non-examining physician of claimant's RFC was one of six reasons why substantial evidence did not support ALJ's decision denying benefits), is unavailing. In <u>Langley</u>, the court concluded that "the law of this Circuit does not require an RFC from a physician." <u>Langley</u>, 777 F. Supp. 2d at 1257–60. The court declined to accept the position taken in <u>Coleman</u> because its reasoning "attempt[s] to place the burden of proving the claimant's RFC on the Commissioner at step five" and this shifting of the burden is "inconsistent with the Commissioner's regulations, Supreme Court precedent and unpublished decisions in this Circuit." *Id.* at 1260.

This court agrees with the view expressed in <u>Langley</u>. This court further notes that courts in numerous other cases have also disagreed with the conclusions in <u>Coleman</u> and <u>Thomason</u>, recognizing that an ALJ's RFC determination may be upheld even when there is no RFC assessment by a treating or examining physician. *See* <u>Beote v. Colvin</u>, Case No. 5:12cv115/EMT, 2013 WL 4096161 (N.D. Fla. August 13, 2013); <u>Holloman v. Colvin</u>, Case No. 2:12cv538-CSC, 2013 WL 2903287 (M.D. Ala. June 13, 2013); <u>Webb v. Colvin</u>, Case No. 3:12cv506-CSC (WO), 2013 WL 2567556 (M.D. Ala. June 11, 2013); <u>Nelson v. Colvin</u>, Case No. 2:12cv498-TFM (M.D. Ala. April 25, 2013); <u>Packer v. Astrue</u>, Case No. 11-0084-CG-N, 2013 WL 593497 (S.D. Ala. Feb.14, 2013); <u>Daniels v. Astrue</u>, Case No. 2:11-cv-569-TFM, 2012 WL 1564415 (M.D. Ala. April 30, 2012); and <u>Daniels v. Astrue</u>, Case No. 2:11-cv-371-TFM, 2012 WL 353756 (M.D. Ala. Feb. 2, 2012).[14] The

---

[14] Plaintiff's counsel in the instant case represented the claimant in four of the above cases (<u>Beote v. Colvin</u>, Case No. 5:12cv115/EMT, 2013 WL 4096161 (N.D. Fla. August 13, 2013); <u>Holloman v. Colvin</u>, Case No. 2:12cv538-CSC, 2013 WL 2903287 (M.D. Ala. June 13, 2013); <u>Daniels v. Astrue</u>, Case No. 2:11-cv-569-TFM, 2012 WL 1564415 (M.D. Ala. April 30, 2012); and <u>Daniels v. Astrue</u>, Case No. 2:11-cv-371-TFM, 2012 WL 353756 (M.D. Ala. Feb. 2, 2012)). While <u>Beote</u> (a case before the undersigned) and <u>Holloman</u> were not decided until after counsel filed his memorandum in support of the complaint in this case on October 11, 2012, both of the <u>Daniels</u> cases had been decided. Counsel obviously was aware of these two cases when he submitted his instant memorandum yet he cited neither case, both of which disagree with <u>Coleman</u>; the earlier <u>Daniels</u> case (decided on February 2, 2012), also discusses <u>Thomason</u>'s

court therefore rejects Plaintiff's contention that the ALJ was required to support his RFC assessment with a treating or examining physician's RFC assessment.

Plaintiff further contends that, particularly given the lack of any RFC assessment by a treating or examining physician, the ALJ failed to fully develop the record regarding the severity of his impairments and their effect on his ability to work (doc. 11 at 11). According to Plaintiff, the ALJ should have ordered a consultative examination "to determine the full extent of [Plaintiff's] impairments . . . as well as develop a RFC supported by a physician's opinion" (*id.*). As discussed above, Plaintiff's argument that the ALJ is obliged to obtain an RFC assessment prepared by a treating or examining physician is incorrect. Moreover, although it is well established that the ALJ has an affirmative duty to develop a full and fair record, Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); Lucas v. Sullivan, 918 F.2d 1567, 1573 (11th Cir. 1990), she is not required to search to the last document to find every possible piece of relevant evidence. Nor is she required to obtain a consultative examination unless the record establishes that such an examination is necessary to enable her to make a decision. *See* Reeves v. Heckler, 734 F.2d 519 (11th Cir. 1984). Thus, where the ALJ has sufficient evidence to decide the case, she may do so. Graham v. Apfel, 129 F.3d 1420 (11th Cir. 1997). In determining whether remand is appropriate, courts should be guided "by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir.1995) (quotations omitted). Where the record is complete and adequate to make a decision, there is no prejudice. Graham, 129 F.3d at 1423.

Here, the ALJ had sufficient evidence to decide the case. Before her were the reports of numerous radiological and other studies of Plaintiff's spine, left knee, and heart conditions. The ALJ also had before her the reports of Plaintiff's cardiac surgery and numerous visits to Dr. Haghighat and the office of Dr. Hatcher dating back to at least 2006 and continuing to June 2010. Additionally, the ALJ relied on the testimony of the VE, and she reviewed the report of Dr. Horvat, an examining

---

lack of citation to any legal authority that require an assessment by a physician to make an RFC determination.

In Holloman, the court "note[d] with dismay that the plaintiff failed to cite for the court the many cases which disagree with Coleman [ ]. Counsel is reminded of his obligation of candor to the court." Holloman, 2013 WL 2903287, *5 n.7. This court is likewise dismayed by the failure of Plaintiff's counsel to disclose unfavorable cases and also reminds him of his duty of candor to the court, a duty that applies, if anything, with greater force where the unfavorable cases that must be reported to the court include those in which counsel personally participated.

psychologist,[15] and those of the non-examining consultants, Drs. Steele, Dawson, Conger, and Meyers. In light of the evidence before her, the ALJ had ample information to determine Plaintiff's impairments and ability to work. Indeed, based on the aforementioned records, the court finds that the ALJ's determination that Plaintiff retains the RFC to perform light work, with a sit/stand option (and no mental limitations), is supported by substantial evidence. Moreover, Plaintiff has not shown that he suffered prejudice as a result of any failure of the ALJ to perform further factfinding. There is no basis to conclude the ALJ's decision would have changed in light of any additional information. Thus, the record was complete and sufficient to make a decision, and the ALJ had no need or duty to develop the record further.

In Ground 4, Plaintiff asserts that the ALJ erred by failing to assess his ability to alternate sitting and standing as required by SSR 96-9p, which states that "[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." SSR 96-9p, 1996 WL 374185, at *7. According to Plaintiff, although this Ruling requires the RFC to be specific with regard to the claimant's need to alternate sitting and standing, the sit/stand option imposed by the ALJ in her RFC assessment is "vague and indefinite, and requires further clarification as to exactly what its meaning and effect would be in a work-setting." (doc. 11 at 18). Additionally, Plaintiff contends the ALJ erred by relying on the VE's testimony when the hypothetical posed to the VE was not adequately specific concerning the sit/stand option.

As an initial matter, SSR 96–9p is titled: "Policy Interpretation Ruling Titles II and XVI: Determining Capability to do Other Work—Implications of a Residual Functional Capacity for Less Than a Full Range of *Sedentary* Work." SSR 96-9p, 1996 WL 374185, at *1 (emphasis added). The purpose of SSR 96–9p is "[t]o explain the Social Security Administration's policies regarding the impact of a residual functional capacity (RFC) assessment for less than a full range of *sedentary* work on an individual's ability to do other work." *Id.* (emphasis added). By its title and stated purpose, therefore, SSR 96-9p applies to claimants with an RFC of less than the full range of sedentary work,

---

[15] Plaintiff contends that "the assessment of Dr. Harvat [sic] is completely void of an assessment concerning [Plaintiff's] ability to perform work activities such as sitting, standing, walking, lifting, carrying, or bending" (doc. 11 at 11). Plaintiff is reminded that Dr. Horvat is a psychologist, not a physician. Accordingly, Dr. Horvat is not qualified—and would not be expected—to provide an assessment of a claimant's physical capacities.

not to claimants with an RFC to perform light work such as Plaintiff in the instant case.  *See* <u>Boyce v. Astrue</u>, Case No. CV 111-016, 2012 WL 1245658, at *3 (S.D. Ga. March 15, 2012) ("Because Plaintiff was limited to light work with the additional restriction of needing a sit/stand option, he misses the mark with his citation to Social Security Ruling 96–9p, as the plain language of that ruling makes clear that it only applies in cases involving individuals with '[an RFC] assessment for less than a full range of sedentary work.'"); <u>Kestler v. Astrue</u>, Case No. 2:10–cv–220-DNF, 2011 WL 4004898, at *11 (M.D. Fla. Sept. 9, 2011) ("Contrary to the [p]laintiff's argument, the ALJ was not required by [SSR 96–9p] to specify the exact frequency which the [p]laintiff needed to sit or stand.  [SSR 96–9p] applies only in situations where an individual's RFC is limited to sedentary work."); <u>Cooper v. Astrue</u>, Case No. 4:08-cv-479MP/WCS, 2009 WL 3242029, at *12 (N.D. Fla. Oct. 6, 2009) ("[SSR 96–9p] relates to the 'implications of a residual functional capacity for less than a full range of sedentary work.'  By its title, it does not apply to a claimant with a residual functional capacity for a limited range of light work.").  Plaintiff's claim that the ALJ erred by failing to apply SSR 96-9p when assessing his RFC for light work therefore is without merit.

Nor did the ALJ err by relying on the VE's testimony that Plaintiff could, with a sit/stand option, perform the jobs of silver wrapper, mail clerk, and cashier II.  Although the ALJ did not specify in the hypothetical question posed to the VE the frequency with which Plaintiff needed to change his sit/stand position, the ALJ's instruction to the VE to include a sit/stand option (tr. 79–80) contains the reasonable "implication" that "the sit/stand option would be at [Plaintiff's] own volition." <u>Williams v. Barnhart</u>, 140 F. App'x 932, 937 (11th Cir. 2005) (per curiam ) (concluding that ALJ's hypothetical question was not incomplete because it did not specify the frequency the claimant needed to sit or stand; "the reasonable implication of the ALJ's description was that the sit/stand option would be at [the plaintiff's] own volition.").  In addition, the court in <u>Williams</u> noted that the plaintiff had "failed to offer any evidence that he could not perform the unskilled jobs identified by the [VE] based on his ability to sit or stand for any period of time," which meant he had not "establish[ed] his burden of his inability to perform the identified jobs."  *Id.*  The same is true here:  Plaintiff has not pointed to evidence that any limitation regarding his ability to sit or stand would prevent him from performing the unskilled jobs of silver wrapper, mail clerk, or cashier II.  Thus Plaintiff has failed to satisfy his

step five burden of showing he cannot perform the work suggested by the Commissioner. Hale, 831 F.2d at 1011.

As a final matter, the court notes that Plaintiff also makes the brief, undeveloped argument that the ALJ erred by failing to assess his work-related abilities, as set forth in SSR 96-8p (doc. 11 at 11).[16] The Eleventh Circuit has found that where an ALJ considers all of the evidence, determines that the claimant is not disabled, and poses a hypothetical to a VE which limits the claimant to a certain level of exertional activity, she has complied with the requirements of SSR 96–8p. *See* Freeman v. Barnhart, 220 F. App'x 957, 960 (11th Cir. 2007). Here, the ALJ considered all the evidence and found it did not support the level of disability claimed by Plaintiff. She also posed a hypothetical question to the VE that limited Plaintiff to light exertional work with a sit/stand option, thereby addressing the functional limitations the ALJ found to be supported by the record. Accordingly, this court finds that "the ALJ adequately analyzed and described [Plaintiff's] functional capacity" and thus complied with the requirements of SSR 96–8p. Freeman, 220 F. App'x at 960.

## VI.    CONCLUSION[17]

---

[16] SSR 96-8p provides:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184, *1 (July 2, 1996).

[17] The court recognizes that counsel has submitted memoranda in other cases pending before it that may not comply with the court's instructions regarding accurate, precise citations to the record. The court will not penalize counsel for this unacceptable practice with respect to any memorandum that was filed February 1, 2013, or earlier, such as the instant case or, obviously, any case in which the court has already ruled. Counsel is informed, however, that memoranda filed after February 1, 2013, that do not comply with the court's instructions to provide accurate, precise citations to the record likely will result in the contentions being disregarded for lack of proper development. Accordingly, counsel would be well-advised to review all memoranda filed after February 1, 2013, in cases before the undersigned to assure their compliance with the Scheduling Order's instructions; if the memoranda are non-compliant, counsel may seek leave of court to file amended memoranda, which leave will be granted provided he proceeds within fourteen days of the issuance of this Order. If counsel has also failed to advise the court of cases that are unfavorable to positions he advocates, he may also use this opportunity to file amended memoranda that make the appropriate disclosures.

Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.  The Commissioner's decision is supported by substantial evidence on the record as a whole and should not be disturbed, 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560.

Accordingly, it is **ORDERED**:

1.     The record shall reflect that Carolyn W. Colvin is substituted for Michael J. Astrue as Defendant in this action.

2.     The decision of the Commissioner is **AFFIRMED** and this action is **DISMISSED**.

3.     The clerk is directed to **CLOSE** the file.

At Pensacola, Florida this 30<u>th</u> day of August 2013.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**